793 A.2d 55 (2002)
349 N.J. Super. 89
Stephen and Gina HERNER, Plaintiffs-Appellants,
v.
HOUSEMASTER OF AMERICA, INC., and HouseMaster of South Jersey, Defendants-Respondents, and
Yolanda A. Borgesi, Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted October 23, 2001.
Decided March 11, 2002.
*56 Tomar, O'Brien, Kaplan, Jacoby & Graziano, Cherry Hill, for appellants (Ronald A. Graziano, of counsel; Kristine A. Phillips, on the brief).
Daniel McCormack, Audubon, for respondent HouseMaster of America, Inc.
Daniel Posternock, Delran, for respondent HouseMaster of South Jersey, joins in the brief of respondent HouseMaster of America, Inc.
Before Judges SKILLMAN, WALLACE, and WELLS.
The opinion of the court was delivered by WELLS, J.A.D.
The issue raised on this appeal is whether the plaintiffs, Stephen and Gina Herner, proved sufficient facts to conclude that defendants HouseMaster of America, Inc. and HouseMaster of South Jersey (together known as HouseMaster) committed consumer fraud, thus justifying an award of counsel fees and costs.[1] The Herners settled their claims for compensatory damages against HouseMaster, but reserved the right to proceed with their claim for counsel fees and costs with a stipulated cap of $125,000. A two day non-jury trial ensued after which the judge briefly announced that he believed HouseMaster's witnesses and dismissed the claim. We reverse and remand for a determination of the costs and a reasonable counsel fee.
The trial revealed the following facts: The Herners were first time home buyers and possessed no experience in any construction trade. Stephen Herner was age 37 and a truck driver; Gina Herner was age 30, a high school graduate who held various clerical positions following her graduation. They conducted their search for a home through a real estate agent who happened to be Gina Herner's aunt. The couple wanted to spend about $100,000 and had garnered savings of $10,000 for a deposit. They found a home which suited their needs at 432 First Avenue in Bellmawr. In May 1995 they signed an agreement of sale to purchase this home for $102,000.
The realtor then gave the Herners three sales brochures of home inspection services. They reviewed the brochures, made a call or two and scheduled an appointment with HouseMaster who assigned one of their full time inspectors, Joseph J. Tangradi, to inspect the home. When Mr. Tangradi arrived, he presented a two-sided, preprinted single page contract consisting of nine compactly worded clauses to the Herners. Some of the printing was in bold type. Paragraph A read:
LIMITED-TIME GUARANTEED INSPECTION. In approximately 2-3 hours, for an average house, the Company will provide the Client with their professional opinion of the condition of the major elements of the house at the time of the inspection. The Company will provide the Client with a complimentary Guarantee against unexpected, *57 major repair expense for a period of 90 days from the inspection date or 30 days from title transfer, whichever occurs first. This Guarantee, including its term and conditions, will be forwarded to the Client following the inspection.
The cost of this inspection and complimentary Guarantee is $335.
Stephen Herner signed the contract.
Tangradi conducted the inspection in the presence of the Herners and their realtor over the course of several hours on May 13, 1995. He thereafter discussed the condition of the house with the realtor and the Herners verbally and filled in a preprinted written report consisting of fifteen pages and a signature page. The report itemized Tangradi's inspection of fifty-four items contained in seven major household systems: (1) roofing and exterior elements; (2) garage and site elements; (3) attic and interior elements; (4) kitchen and bathrooms; (5) foundation elements; (6) electrical and plumbing systems; and (7) heating and cooling systems.
While we will detail later in this opinion some of Tangradi's specific findings, suffice it to say that of the fifty-four items he examined, Tangradi found that thirty-seven were satisfactory, fourteen others were satisfactory but he had additional comments for each one, and three were rated fair. The HouseMaster report defined satisfactory as "functional at the time of inspection with no visible evidence of a substantial defect." It defined fair as "functional at the time of inspection (although deficiencies may exist) but beyond average age and/or condition limits: capable of being used for a limited period of time."
The Herners carefully reviewed the Tangradi report. Gina Herner testified:
Q. Okay. Now, Mrs. Herner, after reading the express report with your husband that evening, what was the overall conclusion that you reached regarding the condition of the home that you were buying?
A. That everything seemed to be fine, that the inspection went well.
Q. Did you have any concerns about the home needing major repairs?
A. No.
...
Q. Did you ultimately buy the house?
A. Yes, we did.
Q. What role, if any, did the express report done by Mr. Tangradi play in your purchase of the house?
A. Somewhat, I guess, we did rely on his report, the report concerned that, you know, everything was good.
Q. Did you believe that the report accurately reported on the condition of the house?
A. At thisno, not what we know now.
Q. How about back then when you actually went to the settlement on the house?
A. Yeah, we did.
The Herners went to settlement on the home in July 1995 and moved in promptly thereafter. In mid-September, Mrs. Herner first noticed a leak in the kitchen ceiling. She testified:
Q. And how did you discover the leak?
A. I was actually getting ready for a housewarming. We were going to have company, and the weekend before, I was making meatballs and everything. And I was putting them in the freezer. And it was raining that evening, and water started dripping on my head above the refrigerator, where I was standing in front of the refrigerator. And here the piece of spackle tape *58 had fell down and water was dripping out of the ceiling.
Q. Okay. And what did you do?
A. Cried.
Q. Okay. And after you stopped crying, what did you do?
A. We, I called my realtor. I called my aunt and said, you know, what's, can I do? What, where should I turn? Who should I talk to about this?
Q. And what was the next thing you did?
A. Tried to get in touch with HouseMaster.
Q. Did you get in touch with them?
A. After repeated times trying to get in touch with them.
Q. Okay. And what was their response to you?
A. They said that they would send another inspector out, or an inspector to come and check out the roof.
Q. And did they do that?
A. Yes.
Q. And what was their ultimate response, or their last response to you? Do you recall?
A. Their last response was they couldn't help me.
Q. And did they tell you why?
A. The guarantee had lapsed.
Leaks subsequently developed in the ceiling in most of the other rooms. Eventually, the Herners discovered other defects in the house. The lights began to flicker and fuses blew. The floor in the living room was "bouncy." The Herners instituted suit in May 1996 against HouseMaster alleging negligence, fraud and consumer fraud against it in connection with the inspection report issued to them in May 1995. In November 1999, the parties settled the Herner's claims for compensatory damages for $37,000. The settlement, which was placed on the record, specifically reserved the Herner's right to seek counsel fees and costs under the Consumer Fraud Act, N.J.S.A. 56:8-19, with a stipulated cap of $125,000.
The non-jury trial on the reserved issues proceeded on March 14 and 15, 2000. In addition to the testimony of witnesses, there was admitted into evidence the HouseMaster brochure originally examined by the Herners, the "Express Inspection Report" issued to them following Tangradi's inspection, a number of photographs of the exterior and interior of the house, a number of reports by building and construction experts, and copies of HouseMaster sales, marketing and training materials.

I
We begin our analysis of the Herner's claim of consumer fraud with the testimony of the president of HouseMaster of America, Inc., Kenneth Austin. It is particularly apropos that we do so because the trial judge found the HouseMaster witnesses credible. Austin's company is a franchiser of the HouseMaster system throughout the country. That system is a system of inspecting houses for consumers. Although HouseMaster's franchisees get referrals from a number of sources, 80% of them are from realtors. HouseMaster provides training and educational seminars for realtors for the purpose of informing them about HouseMaster.
The franchisees employ inspectors trained by NIBI (National Institute of Building Inspectors), another entity owned by HouseMaster which has a facility in New Jersey. NIBI also issues technical bulletins about various aspects of the current technology of the home building industry. With respect to the inspections themselves, Austin said:
*59 Q. What is the objective inwhat is HouseMaster's objective in the type of inspection that it does? What is it trying to give to its customers?
A. It's trying to give a balanceda balanced inspection, the good and the bad of the house. We try to go from top to bottom, inside and out.
Q. Why a balanced inspection?
A. Well, you have to appreciate the fact that a large percentage of our customers are first time home buyers, very much like the Herners. And they're very apprehensive about this bigbig debt that they're about to go into, very, very nervous.
Many times, their parents do come along for support. And we try to teach our inspectors to be very patient with these people. Wewe don't want to blow things out of proportion for them. On the other hand, we don't want to minimize anything. We want to give them a balanced view of the house, good and bad.
On cross examination Austin stated he had no construction nor inspection background at all but that his training was in sales and marketing. He then testified:
Q. In New Jersey anyway, at the time you do your inspection, the prospective buyer has already signed a contract, you know that, right?
A. Yes.
Q. And, therefore, the prospective buyer has already indicated that they desire to buy the house. They've been on buying the house. You know that too, right?
A. True, yes.
Q. Okay. So, why is it HouseMaster's obligation to point out good things in the house to that buyer who's already decided to buy the house? Why would you want to do that?
A. Because we haveI said before, we have very nervous buyers. If you go along and point out just all negatives, you can psych that buyer into not buying a house thatreally that they want. Before they order an inspection you, your point, I guess and they're willing to spend $300 for an inspection, they want that house.
Q. They do want the house, right? And they made a decision they do want the house?
A. Barringbarring finding out something disastrous about the house, they want to buy that house.
Q. So you train your people to point out the bad things they find
A. Yes.
Q. but you also train to point out the positive things they find?
A. Yes. If you [go] through a house and say, problem, problem, problem, problem, problem, problem, problem, in the minds of a lot [of] young buyers, they're going to say, this is a problem house. And that's not necessarily true.
...
Q. So why does HouseMaster care if any particular person buys a particular house?
A. It's likewe equate it to going in to a doctor for a physical. If you go in there and you just get bombarded with all negatives, you know, you're going to be so depressed. They tell your blood pressure is good, this is not so good. We try towe try to point out to the buyer that if the roof is satisfactory and in good shape, gee, that's great. And the buyers feel good about that. My God, I'm a smart buyer.
Q. Well
*60 A. If on the other hand, the hot water heater is defective, they can accept that.
Q. Do you train your inspectors to search for a way to find something positive to say about the house?
A. No, not necessarily.
...
Q. Do you think your customers want to be involved with HouseMaster, for any reason at all, on or off the clock, so the HouseMaster inspector can say, it's a nice neighborhood or it's a nice lawn?
A. No, we don't talk about the lawn. This is at the end of the inspection and you sayit's like shaking hands with somebody and saying, good luck. It doesn't alter the inspection one iota.
Q. But you train your inspectors not just to say good luck You train them to say something positive about the house, do you not?
A. We like you to leavewe like to leave on a positive note.
Q. Why?
A. We justwe just think that's a nice thing to do.
Austin was then shown the Inspector Guidelines Manual which is distributed to all franchisees for optional, voluntary use by inspectors. Austin indicated it represented the HouseMaster philosophy. It was the manual in use at the Bound Brook office of HouseMaster from which Tangradi was assigned. A part of the manual stated: "We all must be committed to our marketing program. As the inspector, you are actually the most important salesperson on our team." Austin's attention was drawn to page six which stated:
Here are some important guidelines we expect you to follow that are consistent with our Marketing plan. Please review them AND learn them. We consider them equally as important as your technical knowledge. Furthermore, by following these guidelines, you'll find that you will increase the number of inspections you perform, because you will specifically be requested by agents and customers alike.
The examination went on to the following passage in the manual.

Don't dwell on the negative aspects of the house. We promote the fact that an inspection should be an impartial evaluation of the major elements of property, both negative and positive. Positive aspects should be pointed out clearly as well as the negative conditions, so that the buyer can make a balanced decision. We want the buyer to be able to weigh the good with the bad. You'll find that all houses have their good points and not so good points. The report should contain both. We also stress that HouseMaster inspectors are very fair in their evaluation and non-alarmists. What this means is that we take the time to fully explain our findings with the buyer and put all findings in perspective. You'll find that the buyer will hang on your every word and action. If you appear surprised or give off negative mannerisms, the buyer will pick it up. Some examples would be rolling your eyes, or an "aha!"! Believe it or not, these are the things that buyers don't forget. A common agent complaint is that inspectors "nit-pick". Many of our competitors see the inspection strictly as a way to find things wrong with the home so that the buyer can negotiate the price of the home. They also feel that unless they find something wrong with the house, their fee is not justified. Because of this, they've given home inspectors, in general, a bad name. Again, do not blow any of your findings out of proportion, *61 and don't feel you are doing the buyer a favor by tearing the house apart unnecessarily. You'll sometimes be asked by the buyer what things they should use to negotiate the price of the house. Again, we can not answer this question. There is no book on what is or is not negotiable. The home inspection is designed to educate the home buyer on the condition of the home, as well as give the home buyer information on how to maintain and operate the home. By the time the home inspection is performed, the price of the house has been negotiated already and very often, regardless of our report findings, that price is non-negotiable. We frequently see homes that are already reduced because of some of the conditions that the seller was aware of, such as an older roof or heating system. However, when we come along and actually put those things in writing, the buyer wants to renegotiate.
Austin was then shown the brochure examined by the Herners and the following colloquy took place:
Q. [referring to the manual, infra, page 12] "We promote the fact that an inspection should be an impartial evaluation of the major elements of property, both negative and positive." Is that true?
A. Yes.
Q. Okay. I'd like you to take a look at what's been marked P-3 in evidence, the brochure. Tell me where it says that in what your customers read?
A. (Witness reviewing brochure)I'm not seeing that word.
Q. Well, do you see that concept?
A. It's an implied concept I'd say.
Q. Show me the part of it that implies that, please.
A. I think if you hire a home inspection company, you would hope that they're impartial.
Q. My question, Mr. Austin, is this. Where, on this brochure, do you tell your customers that you're hiring an impartial housing inspector, not a partial one? Does it say it anywhere?
A. No.
...
Q. Okay. I'm going to read that to you. And it says:
"A common agent complaint is that inspectors nitpick. Many of our competitors see the inspection strictly as a way to find things wrong with the home so that the buyer can negotiate the sale and negotiate the price of the house."
Okay. Now, how do you know that it's a common agent complaint that some inspectors nitpick?
A. We hear it.
Q. The marketing people hear it?
A. Yes.
Q. You've heard it yourself, haven't you?
A. Sure.
Q. And why don't agents like that? What happens when an inspector nitpicks?
A. Because he'llyou just blow things totally out of proportion.
Q. And what happens?
A. They probably won't end up buying the house for the wrong reasons.
Q. And you heardand you heard Charlene Konopka yesterday
A. Yes.
Q. indicate how she feels and how real estate agents feel when a deal gets blown. Do you remember what she said?
A. No.
*62 Q. It was words like she was very angry or very upset
A. Oh, sure, yes.
Q. right?
A. Yes.
Q. And that's gonna have impact on your referrals, isn't it?
A. Absolutely.
To contrast HouseMaster's inspections for realtors with those it conducts for relocation companies, Austin was shown another section of the manual. It stated:
Again, to re-emphasize, the relocation market for home inspections is enormous, and inspection one is well positioned to be the leader in the relocation home inspection industry. However, there's a little extra effort needed by all of us to make this successful. You'll find relocation inspections to be a refreshing break from your other inspections, because there is no agent or home buyer involved. However, unlike a normal home inspection, a relo company need us to nitpick. These companies never physically see this house, so we have to be their eyes for them. Note everything you see on these reports, regardless of how minor.
The following colloquy ensued regarding that passage:
Q. Okay. Now, let me contrast that for a moment, if I can, to relocation inspections.
A. Okay.
Q. Now, you recall that back then, you actually instructed your inspectors to nitpick when they were doing a relocation inspection, isn't that right?
A. I didn't think we used that term.
...
Q. Okay. And it says, "However, unlike a normal home inspection, a relo company needs us to nitpick."
A. Okay.
Q. So there you want your agents-your inspectors to nitpick, don't you?
A. Yes.
Q. When it's a relocation company you're doing an inspection for, it is the relocation company that is going to be sending you more business in the future you hope, isn't it?
A. Yes.
Q. In fact, on that same page, you sayI'm sorry, on page 56, the first full paragraph, you say:
"Relocation companies can throw quite a bit of business our way so we want to do everything in our power to keep them happy."
Correct?
A. Absolutely.
Q. And that means nitpicking, right, what you said on the next page?
A. Thatlet me explain that a little bit. As we go on and say, a relocation company never physically sees the house. So, while we can do an inspection for the Herners and find a nail popped in a wall and they can see it, we don't have to put a mention of that in the report at all. Or if we see that the paneling is scratched a little bit, they see it, we see it. We don't have to go to great lengths to put that in the report. Or if we see that the carpeting is torn, we don't have to do that. With a relocation inspection, they want to negotiate everything possible.
Q. Well, let me ask you a question then. If the relocation company is not going to see the house, then how come you don't want to put in positive things in that report, just like you do in the other one?
*63 A. Because they're big boys. They're a little different than the first time home buyer.
...
Q. We have a few more to go through. Actually, let's take stay there for a minute. The real reason you tell the relocation company all the nitpicky things is because they may use that to negotiate the price, isn't that true?
A. True.
Q. Okay. And if you help them get a lower price, they're gonna want to give you more business, isn't that true?
A. Thatthat never seems to come into the equation.
Q. You don't think the relocation companies care about that?
A. They do care about that.
Austin conceded the manual also recommended to its inspectors that they not advise the buyers: (1) that they are part time inspectors[2]; (2) that they are new inspectors; and (3) to appear as if they do not know the realtor even where they have done prior inspections for that realtor. It was pointed out that the brochure did not advise the Herners that the inspector is to be mindful of everyone's interest including the buyers, the sellers and the realtors. It does not reveal HouseMaster indemnifies the realtor and other referral sources from liability in the case of a faulty inspection. It does not reveal that NIBI is a company started by and owned by HouseMaster or that it is not a government or government certified agency. The brochure does not reveal when the 90 day guarantee begins to run.
The cross examination concluded with the following exchange:
Q. You would agree that for an inspector to be doing the proper job, that inspector should be working for the best interest of the home buyer and not anyone else
A. True.
...
Q. He shouldn't have any concern for any other individual or any other business, isn't that right?
A. No, I wouldn't say that. I think your client is your home buyer, but you still have a responsibility to the owner and to whoever is referring to do a fair job.
Q. And do you tell your perspective buyers that HouseMaster has a responsibility to be fair to everybody involved in the transaction and to do a fair job to all of them, do you say that anywhere in that brochure?
A. No.
On redirect the following exchange took place:
Q. Okay. Have you ever heard the term, "deal killer?"
A. Yes.
...
Q. What do you understand that to mean?
A. It means it'sit's a commonly used term in the real estate community to indicate aan inspector who killed the salekilled a deal.
Q. Is that an inspector that is so extreme in his reports, that the deal is killed as a result of it?
A. Yes.
Q. What would happen if all inspectors were deal killers?
A. All the home inspection businesses would die, I think.

*64 II
We now turn to the evidence of the inspection report itself and the condition of the house which was the subject of the report. We have previously characterized the report in general terms. What follows are the ratings given by Tangradi followed by passages from the admitted reports of the experts for both sides. For the sake of brevity we have restricted this analysis to three major systems which formed the bulk of the expense which faced the Herners following their purchase: the roof, the flooring and the electrical system.
I. Roof, Attic Sheathing and Attic Framing
The HouseMaster Report dated May 13, 1995 stated:
Roofs: Main Roof CoverSatisfactory. [Satisfactory defined as functional at the time of inspection with no visible evidence of a substantial defect.] Estimated Age: 6 years, with a life span of 16 to 20 years. Comments: Exception: damaged/cracked shingles along lower course in rear.
Attic: SheathingSatisfactory. [No comments on sheathing.]
Attic: FramingSatisfactory. Comments: Lack of collar ties in larger section. However, no rafter to ridge pole separation observed. (Cathedral area not accessible).
The plaintiff's expert report dated December 10, 1996 stated:
The roof is covered with one visible layer of asphalt/fiberglass roof shingles, estimated to be about 15 years old. Signs of wearing was noted to the granule coating. This is an indication that the roof is wearing and will require replacement. Stains were noted in the kitchen, laundry room and family room ceilings as well as in part of the attic, especially around the chimney.
Due to the above noted conditions, I recommend budgeting for a new roof as replacement will soon be required.
...
In my professional opinion, HouseMaster's inspector should not have estimated the roof to be 6 years old with a remaining life of 10-14 years. This gives their client a false sense of complacency toward anticipated replacement of the roof.
...
The plaintiff's damages expert estimated that it would cost $10,220 to repair the roof.
The defendant's expert report dated April 26, 1996 stated:
Water stains and separation of the drywall joint in the kitchen clearly indicates water penetration through the roof and attic. In the attic directly above the stain were found two plastic basins partially filled with water. The insulation between the ceiling joists was removed and, in its place a comforter was laid, presumably to absorb leakage. The comforter was, in areas, wet to the touch. Water stains were seen on the rafters and dry rot found in the sheathing in at least two locations.... A visual inspection of the roof was made from the ground. Although the roof was partially covered with snow and, as such, not fully accessible, it was apparent from those areas that could be seen that the roof had reached the extent of its expected life.
Excessive deflection [of the roof rafters at the rear of addition] has already exhibited itself by the crack in the dining room ceiling. In addition, roof planking between the rafters has cracked in several areas and shows signs of separating along the tongue and groove joints. In *65 one area, the roof plank has broken loose from a rafter and hangs separated from the roofing material. The slope of the rear roof is much more shallow than the main roof and the span is greater as well. Therefore, the rear roof is unacceptable.
II. Crawlspace Girders
The HouseMaster Report dated May 13, 1995 stated:
Crawl SpacePiers/ColumnsSatisfactory.
[No comments.]
Crawl SpaceMain BeamsSatisfactory.
[No comments.]
Plaintiffs' damages expert estimated that it would cost $3,500 to repair the girders:
Install two new girders in crawl space of living room. Install new pier with proper footing. Install two 2x8 on old girder. Relocation heat to install new girders. Remove all wood on block piers and install new block on top of old piers. Install new 1/8" diameter anchor as needed maximum of 8' on center to secure the house to the foundation.
The defendant's expert report dated April 26, 1996 stated:
The girder was supported at each end by piers built integral with the foundation walls and supported along the span by block piers. Although the floor framing appears acceptable, the house was not properly anchored to the foundation. Only three anchor bolts were noted, one each on the north, east, and west sides of the house. None were secured with bolts. Additionally, the main girder is not secured to the foundation, either by anchors or by the grouting of its ends into the pier. The girder was shimmed at all piers by large 2x4's and scrap wood and block.
III Electrical System
The HouseMaster Report dated May 13, 1995 stated:
ElectricalMain PanelSatisfactory.
[No comments.]
ElectricalWiring/DevicesSatisfactory. Cover exposed junction box over attic entrance. Majority two prong receptacles. Review "grounding provisions" on page 14.
His report dated December 10, 1996 stated:
The worn electric service entry cable should be replaced for safety. Worn cable casings have a tendency to allow water to enter the cable and be drawn into the service panel box where the water can make contact with conductors. This results in possible sparking or can cause electrocution. No ground fault circuit interrupters (GFCI's) were noted. The open attic junction boxes should be covered for safety and the loose junction boxes properly secured. The bathroom exhaust fan should also be properly rewired for safety.
The condition of the electric service entry cable is a serious defect which should have been clearly visible to the HouseMaster inspector and listed in their report as `Fair' or `Poor'. Although the junction box over the attic entrance was mentioned in the HouseMaster report, the other electrical problems both in the attic and in the crawlspace were not mentioned and should have been.
The plaintiff's damages expert estimated that it would cost $2,400 to repair the electrical system.

III
The legal framework of the Consumer Fraud Act (Act), N.J.S.A. 56:8-1 to-106, its interpretation and enforcement are reasonably *66 well settled. The single most important operative provision of the Act is N.J.S.A. 56:8-2. It provides in relevant part:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

[N.J.S.A. 56:8-2].
"An offense arises under the Act from an affirmative act, a [knowing] omission, or a violation of an administrative regulation." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605, 691 A.2d 350 (1997). In order to recover there must be proof that a practice forbidden by the act has resulted in ascertainable loss. Id. at 608, 691 A.2d 350. Unlike common law fraud, "[a]n intent to deceive is not a prerequisite to the imposition of liability" under the Act. Ibid.
The history of the act is one of constant expansion of consumer protection. Id. at 604, 691 A.2d 350. In 1975, the Legislature amended the act to include unlawful practices in the sale or advertisement of real estate. Ibid.; Strawn v. Canuso, 140 N.J. 43, 60, 657 A.2d 420 (1995). Throughout its history, the act has protected consumers from deception and fraud, even when committed in good faith. Gennari, supra, 148 N.J. at 604, 691 A.2d 350; Fenwick v. Kay American Jeep, Inc., 72 N.J. 372, 376-77, 371 A.2d 13 (1977). In this respect it has been held to establish a broad business ethic. In Cox v. Sears Roebuck & Co., 138 N.J. 2, 18, 647 A.2d 454 (1994), the Supreme Court stated:
In respect of what constitutes an "unconscionable commercial practice," this Court explained in Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971), that unconscionability is "an amorphous concept obviously designed to establish a broad business ethic." Id. at 543, 279 A.2d 640. The standard of conduct that the term "unconscionable" implies is lack of "good faith, honesty in fact and observance of fair dealing." Id. at 544, 279 A.2d 640.
In bringing these principles to bear on the facts of this case, we initially acknowledge that the trial judge's finding that Tangradi and Austin were credible witnesses is entitled to deference. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). But we conclude that their testimony does not lead to a conclusion that there was no unconscionable commercial practice proved in violation of the Act. To the contrary in view of the record taken as a whole, we conclude there was an unconscionable commercial practice. Whatever the intentions of HouseMaster's employees, the inspection and report issued by it failed to deliver what HouseMaster represented to the Herners and what the Herners had a right to expect they would receive.
The record before us establishes that what the Herners wanted and what a consumer of home inspection services would generally and reasonably expect is an inspection and report which forthrightly discloses physical conditions of a house which could reasonably affect the health, safety and welfare of its occupants. It should reveal and report conditions which may, presently or in the reasonably foreseeable future, cause the consumer substantial inconvenience or require costly repairs or *67 maintenance expense. Indeed, the purpose of such a home inspection is to give a consumer a rational basis upon which to decline to enter into a contract to buy, to provide lawful grounds to be relieved from a contractual commitment to buy, or to offer a sound basis upon which to negotiate a lower price.
In contrast, what the Herners did not want was an inspection whose undisclosed and predominate purpose was to market HouseMaster. The record establishes that the realtor is HouseMaster's customer in fact. Eighty percent of its business comes from realtors. It conducts seminars for them to explain its services. Its informational brochures are left with the realtor to distribute to prospective buyers. At the same time it is undisclosed to the consumer that HouseMaster insures the realtor against liability for a faulty inspection, coverage which is not provided the consumer. By specific training, it would also go undisclosed that a particular inspector had done a number of inspections for a realtor. HouseMaster's worst nightmare is to become known in the real estate brokerage industry as a "deal-killer."
HouseMaster's marketing and training strategy emphasizes rendering a "balanced" report which stresses the positive aspects of a house, as well as the negative in such a way as to water down negative findings such that a consumer will have as little basis as possible to call the sale off or have solid evidence upon which to renegotiate the price. This marketing and business philosophy is undisclosed to the consumer. The informational brochure reviewed by the Herners deceptively highlights HouseMaster's independence, attention to detail and thoroughness. Yet, inspectors are trained not to reveal they are part time or may be early in their careers as inspectors. It is not disclosed that NIBI is an entity wholly owned by HouseMaster and possesses neither any governmental affiliation nor any accreditation from the construction code or building code enforcement community. The brochure fails to disclose that the 90 day guarantee promised by HouseMaster lapses 90 days from the inspection rather than from closing, information which in this case, at least, vitiated any value to the Herners in the guarantee.
The record thus establishes an inherent conflict between the essential purposes of a home inspection to a consumer as described above and the duty of a realtor who is engaged to sell a home promptly at the highest price it will bring. It further establishes a pattern of non-disclosure on the part of HouseMaster such as to render its report worthless to consumers.
HouseMaster's reports strum the chord of high hopes on the part of those consumers who, having already committed themselves, yearn for confirmation that they have made a wise decision. But its carefully couched and deliberately softened language fails to raise troubling issues which might challenge that decision. We reject Austin's characterization of this approach as "impartial." At the expense of the consumer, it favors sellers and the realtors who represent them in the market place. In contrast, for the professional buyers of homes for the relocation market, the "big boys," a HouseMaster inspection picks out and reports every "nail pop" that could affect the judgment to buy. Such a stark difference in the approach to an "impartial" inspection is further evidence of unconscionable commercial practice.
In this case, HouseMaster's system of home inspection resulted in a report to the Herners which was so "balanced" as to render it pablum and worthless. Tangradi personified HouseMaster's marketing philosophy. His report told the Herners nothing important about the condition of *68 the house they had agreed to buy but undoubtedly pleased the realtor. In that respect it was affirmatively misleading. Of fifty-four items inspected, fifty-one were marked "Satisfactory", HouseMaster's highest rating, some with comments. None were marked "Poor." And yet within months of closing, the Herners were confronted by thousands of dollars of ascertainable loss in the form of repairs including the replacement of a roof near the end of its useful life.
We reverse. As a result of the judge's ruling, he did not consider the issue of a reasonable counsel fee award to which plaintiffs were entitled. N.J.S.A. 56:8-19. We remand for findings and conclusion with respect to that issue.
NOTES
[1] HouseMaster of America, Inc. and HouseMaster of South Jersey are franchiser and franchisee respectively. The former indemnifies the latter and neither the trial court nor this court have been invited to rule on any issue of their liability inter se. The non-appealing defendant Yolanda A. Borgesi was the seller of the premises in question. No one contended she was liable for counsel fees under the Consumer Fraud Act.
[2] We note that Tangradi was both a full time inspector and had two years experience in performing inspections at the time he inspected the Herner house.