841 A.2d 907 (2004)
366 N.J. Super. 485
Eric LUCIER and Karen A. Haley, Plaintiffs-Appellants,
v.
Angela M. WILLIAMS, James V. Williams, and/or Cambridge Associates, LTD., and/or Al Vasys, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 9, 2003.
Decided February 13, 2004.
*908 Anthony J. Brady, Jr., Voorhees, attorney for appellants.
Amacker & Singley, attorneys for respondents Cambridge Associates, Ltd. and *909 Al Vasys (George J. Singley, Mount Laurel, on the brief).
Respondents Angela M. Williams and James V. Williams did not file a brief.
Before Judges KING, LINTNER and LISA.
The opinion of the court was delivered by LISA, J.A.D.
We consider in this appeal the enforceability of a limitation of liability provision in a home inspection contract. The Law Division judge found the provision enforceable, and granted partial summary judgment in favor of the home inspector. The effect of this order was to limit the home buyer's potential recovery to one-half of the fee paid for the home inspection service, namely $192.50. We hold that this limitation of liability provision is unconscionable, in contravention of public policy, and is therefore unenforceable. Accordingly, we reverse.[1]

I
Plaintiffs, Eric Lucier and Karen A. Haley, a young married couple, were first-time home buyers. They contracted with defendants, Angela M. Williams and James B. Williams, to purchase a single family residence in Berlin Township for $128,500. Lucier and Haley engaged the services of Cambridge Associates, Ltd. (CAL) to perform a home inspection. Defendant Al Vasys had formed CAL and was its president. Only Lucier signed the home inspection agreement, dated July 7, 1999. Lucier dealt directly with Vasys, and Vasys performed the inspection and issued the home inspection report, dated July 14, 1999, on behalf of CAL.
The home inspection agreement contains this provision limiting CAL's liability:
Client and CAL have discussed the risks, rewards and benefits of this assignment and CAL's total fee for services. It is acknowledged that benefits vary disproportionately between them. Accordingly, the risks have been allocated such that the Client agrees that, to the fullest extent permitted by law, CAL's total liability to Client for any and all injuries, claims, losses, expenses, damages or expenses arising out of this Agreement from any cause or causes shall not exceed the total amount of $500, or 50% of fees actually paid to CAL by Client, whichever sum is smaller. Such causes include, but are not limited to, CAL's negligence, errors, omissions, strict liability, breach of contract or breach of warranty. CAL will not be liable to Client or Client's insurers, in contract, warranty, tort, (including negligence), or otherwise, for any special, indirect, or consequential damages resulting from the performance of or failure to perform services under this Agreement, which damages shall include specifically, but without limitation, loss of use, cost of replacement substitute facilities, cost of capital or similar damages.
This provision, as several others in the form agreement prepared by CAL, was followed by a line for placement of the clients' initials. Lucier initialed this provision.
Lucier has certified that when he began to read the agreement, in Vasys' presence, he felt some of the language was unfair and confusing. According to Lucier, Vasys stated he would not change any provisions, that it was a standard contract *910 based upon home inspections done in New Jersey, and Lucier would have to sign the agreement "as-is" or not at all. Vasys does not dispute this, but relies upon Lucier's signing the agreement and initialing the limitation of liability clause. Likewise, Lucier does not deny signing the contract or initialing that clause.
Lucier has also certified other unrefuted facts: he reviewed and relied upon Vasys' resume in entering into the contract; he was never aware that Vasys or CAL were uninsured; he would not have entered into the contract had he known; he was not represented by an attorney in any aspect of this real estate transaction; and he relied upon the home inspection report issued by Vasys on behalf of CAL in going through with the home purchase. The fee for the home inspection contract was $385, which Lucier paid to CAL.
Vasys' resume reveals he holds a 1960 engineering degree with a major in structural design from Villanova University, he is a member of the National Society of Professional Engineers, the New Jersey Society of Professional Engineers and the Building Officials and Code Administrators (BOCA) International, and he has inspected more than 3,000 residential properties for prospective home buyers. The resume further states that Vasys is certified as a BOCA building inspector, he is a licensed New Jersey building inspector and a certified New Jersey radon measurement specialist, and he has qualified and served as a litigation expert involving residential dwellings.
Lucier and Haley went to settlement and obtained title to the property from the Williams'. Shortly after settlement, plaintiffs noticed leaks in the house. They contacted the Williams' regarding the problem, and engaged the services of a roofing contractor. Plaintiffs contend the roof was defective because of a lack of flashing, which they contend Vasys should have observed and reported to them. According to plaintiffs, had they known of this defect, they would have either withdrawn from the agreement of sale or attempted to negotiate a lower price to reflect the cost required to remedy the problem. They contend the cost of repair was about $8,000 to $10,000.
Plaintiffs brought suit against the Williams', CAL and Vasys, seeking damages to compensate them for the loss occasioned by the alleged defect. They asserted various theories, including fraud, breach of warranty, breach of contract, and negligence. After filing their answer, CAL and Vasys moved for partial summary judgment seeking a declaration that the limit of their liability in the action, if any, was one-half the contract price, or $192.50. On January 5, 2001, the motion for partial summary judgment was granted, supported by these findings:
I find that the exculpatory clause in this agreement is enforceable. All right.
I find that the clause is not the product of unduly disproportionate bargaining powers. The bargaining power of both sides was not sufficiently disproportionate.
I don't find the clause to be substantially unreasonable.
Theit's enforceable and it trumps plaintiff's usual rights of recovery.
Plaintiffs' subsequent motion for reconsideration was denied.
Relying on another provision in the contract that all disputes would be resolved through binding arbitration, CAL and Vasys moved for summary judgment to dismiss the complaint. Over plaintiffs' opposition, the motion was granted, and an order was entered on May 11, 2001 dismissing the complaint without prejudice *911 and directing that the matter be arbitrated as provided in the contract.
Meanwhile, Lucier and Haley agreed with the Williams' to submit the dispute between them to binding arbitration. CAL and Vasys did not participate in this proceeding, and they contend they were not even aware of it. As a result of the arbitration proceeding, Lucier and Haley and the Williams' reached an agreement by which the Williams' would pay $8,000 to Lucier and Haley and would receive an assignment of Lucier's and Haley's claim against CAL and Vasys. Lucier and Haley agreed to cooperate with the Williams' in pursuing the claim against CAL and Vasys. A consent order reflecting these terms was entered on July 18, 2002.
Lucier and Haley then filed this appeal, seeking review of the partial summary judgment order of January 5, 2001 (enforcing the limitation of liability provision) and the denial of reconsideration, and of the summary judgment order of May 11, 2001 (dismissing their complaint and directing the matter to arbitration).

II
We begin our analysis of the enforceability of the limitation of liability clause with the fundamental proposition that contracts will be enforced as written. Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 415 A.2d 1156 (1980). Ordinarily, courts will not rewrite contracts to favor a party, for the purpose of giving that party a better bargain. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 161 A.2d 717 (1960). However, courts have not hesitated to strike limited liability clauses that are unconscionable or in violation of public policy. Moreira Constr. Co., Inc. v. Moretrench Corp., 97 N.J.Super. 391, 394, 235 A.2d 211 (App.Div.1967), aff'd, 51 N.J. 405, 241 A.2d 236 (1968).
There is no hard and fast definition of unconscionability. As the Supreme Court explained in Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971), unconscionability is "an amorphous concept obviously designed to establish a broad business ethic." Id. at 543, 279 A.2d 640. The standard of conduct that the term implies is a lack of "good faith, honesty in fact and observance of fair dealing." Id. at 544, 279 A.2d 640.
In determining whether to enforce the terms of a contract, we look not only to its adhesive nature, but also to "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the `adhering' party, and the public interests affected by the contract." Rudbart v. North Jersey District Water Supply Comm'n, 127 N.J. 344, 356, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). Where the provision limits a party's liability, we pay particular attention to any inequality in the bargaining power and status of the parties, as well as the substance of the contract. Valhal Corp. v. Sullivan Assoc., Inc., 44 F.3d 195, 204 (3rd Cir.1995); Marbro, Inc. v. Borough of Tinton Falls, 297 N.J.Super. 411, 416-18, 688 A.2d 159 (Law Div.1996).
The first leading principle is that contractual exemption from liability for negligence is rarely allowed to stand where the contracting parties are not on roughly equal bargaining terms. The farther apart the contracting parties are in their relative strength the greater is the probability that the exculpatory clause will be held invalid.
[Kuzmiak v. Brookchester, 33 N.J.Super. 575, 586, 111 A.2d 425 (App.Div. 1955) (citing 175 A.L.R. 8-140).]
We also focus our inquiry on whether the limitation is a reasonable allocation of risk between the parties or *912 whether it runs afoul of the public policy disfavoring clauses which effectively immunize parties from liability for their own negligent actions. Valhal, supra, 44 F.3d at 202-04; Marbro, supra, 297 N.J.Super. at 416-18, 688 A.2d 159. To be enforceable, the amount of the cap on a party's liability must be sufficient to provide a realistic incentive to act diligently. Valhal, supra, 44 F.3d at 204; Marbro, supra, 297 N.J.Super. at 416, 688 A.2d 159.
Applying these principles to the home inspection contract before us, we find the limitation of liability provision unconscionable. We do not hesitate to hold it unenforceable for the following reasons: (1) the contract, prepared by the home inspector, is one of adhesion; (2) the parties, one a consumer and the other a professional expert, have grossly unequal bargaining status; and (3) the substance of the provision eviscerates the contract and its fundamental purpose because the potential damage level is so nominal that it has the practical effect of avoiding almost all responsibility for the professional's negligence. Additionally, the provision is contrary to our state's public policy of effectuating the purpose of a home inspection contract to render reliable evaluation of a home's fitness for purchase and holding professionals to certain industry standards.
This is a classic contract of adhesion. There were no negotiations leading up to its preparation. The contract was presented to Lucier on a standardized pre-preprinted form, prepared by CAL, on a take-it-or-leave-it basis, without any opportunity for him to negotiate or modify any of its terms. Rudbart, supra, 127 N.J. at 353-54, 605 A.2d 681; Jasphy v. Osinsky, 364 N.J.Super. 13, 21, 834 A.2d 426 (App. Div.2003).
The bargaining position between the parties was grossly disparate. Vasys has been in the home inspection business for twenty years. He has inspected thousands of homes. He has an engineering degree. He has served as an expert witness in construction matters. He holds various designations in the building and construction field. He advertises his company and holds it and himself out as possessing expertise in the home inspection field. Lucier and Haley, on the other hand, are unknowledgeable and unsophisticated in matters of home construction. They are consumers. They placed their trust in this expert. They had every reason to expect he would act with diligence and competence in inspecting the home they desired to purchase and discover and report major defects. The disparity in the positions of these parties is clear and substantial.
The foisting of a contract of this type in this setting on an inexperienced consumer clearly demonstrates a lack of fair dealing by the professional. The cost of homes in New Jersey is substantial.[2] It has often been said that the purchase of a home is usually the largest investment a person will make in life. The purchase of a home is, for most people, a very infrequent occurrence, and a very major undertaking. People may buy a home once in a lifetime, or not very often. Home inspectors, on the other hand, conduct a volume operation. As a businessperson who possesses knowledge about and experience in the industry, Vasys is aware of the cost of repairing major defects. In fact, that is a major selling point of his service to residential buyers.
In most cases, major defects will either not exist or, with due diligence and competence, they will be discovered and reported. *913 We can assume that the contract price here, a little under $400, is typical of fees charged for this service. If, upon the occasional dereliction, the home inspector's only consequence is the obligation to refund a few hundred dollars (the smaller of fifty percent of the inspection contract price or $500), there is no meaningful incentive to act diligently in the performance of home inspection contracts. To compound the problem, such excessively restricted damage allowance is grossly disproportionate to the potential loss to the home buyer if a substantial defect is negligently overlooked. The impact upon the home buyer can be indeed monumental, considering issues such as habitability, health and safety, and financing obligations.
We will not countenance enforcement of the limitation of liability provision in the home inspection contract in this case. To do so would render the underlying purpose of the contract worthless. It is immaterial to our analysis that this provision did not completely bar any cause of action against CAL and Vasys, or that Lucier expressly agreed to it. This excessively restricted damage allowance, which caps the inspector's exposure at $192.50, effectively immunizes him from the consequences of his own negligence. Although the cap is one-half of the fee paid for this job, we nonetheless deem it "so minimal compared with the expected compensation, that the concern for the consequences of a breach is drastically minimized." Marbro, supra, 297 N.J.Super. at 418, 688 A.2d 159 (citing Valhal, supra, 44 F.3d at 204). This is so because the home inspector's exposure is nominal with respect to this job and, more significantly, when viewed in the realistic context of the home inspector's high volume operation. In these circumstances, the limitation clause is tantamount to an exculpation clause, and warrants application of the same policy considerations.
The limitation of liability clause here is also against public policy. First, it allows the home inspector to circumvent the state's public policy of holding professional service providers to certain industry standards. Erlich v. First Nat'l Bank of Princeton, 208 N.J.Super. 264, 287, 505 A.2d 220 (Law Div.1984). Second, it contravenes the stated public policy of New Jersey regarding home inspectors.
We have recently described the purpose of a home inspection contract, that is, to render a reliable evaluation of a home's fitness for purchase:
The record before us establishes that what the [home buyers] wanted and what a consumer of home inspection services would generally and reasonably expect is an inspection and report which forthrightly discloses physical conditions of a house which could reasonably affect the health, safety and welfare of its occupants. It should reveal and report conditions which may, presently or in the reasonably foreseeable future, cause the consumer substantial inconvenience or require costly repairs or maintenance expense. Indeed, the purpose of such a home inspection is to give a consumer a rational basis upon which to decline to enter into a contract to buy, to provide lawful grounds to be relieved from a contractual commitment to buy, or to offer a sound basis upon which to negotiate a lower price.
[Herner v. HouseMaster of Am., 349 N.J.Super. 89, 106, 793 A.2d 55 (App. Div.), certif. denied, 174 N.J. 40, 803 A.2d 636 (2002) (finding that a home inspection company engaged in unconscionable commercial practice in violation of the consumer fraud statute by failing to provide a forthright report disclosing certain physical conditions *914 of the house and by failing to disclose its relationship with the realtor.) ]
We are satisfied that the nature of the service here is a professional service. The essence of a professional service is one that involves "specialized knowledge, labor or skill and the labor or skill is predominantly mental or intellectual, rather than physical or manual." Burlington Township v. Middle Department Inspection Agency, 175 N.J.Super. 624, 631, 421 A.2d 616 (Law Div.1980).
In New Jersey, professionals are held to the standards of their industry. Erlich, supra, 208 N.J.Super. at 287, 505 A.2d 220. There the court held unenforceable an exculpatory clause in a bank's investment management services contract, finding that investment advisors are professionals who hold themselves out to the public as having special knowledge, labor or skill. Id. at 288, 505 A.2d 220.
With professional services, exculpation clauses are particularly disfavored. Id. at 287-88, 505 A.2d 220. The very nature of a professional service is one in which the person receiving the service relies upon the expertise, training, knowledge and stature of the professional. Exculpation provisions are antithetical to such a relationship. It would be indeed a hollow arrangement if a physician could charge $100 for an office visit and then, if, due to negligence, a diagnosis is missed, resulting in a catastrophic illness or even death, the patient's only recourse would be a refund of $50 of the original $100 fee. Certainly, such a provision in a doctor-patient relationship would not be enforceable. A.M. Swarthout, Validity and Construction of Contract Exempting Hospital or Doctor from Liability for Negligence to Patient, 6 A.L.R.3d 704 (1996) ("The application of these principles to exculpatory contracts between hospitals or physicians, on the one hand, and patients, on the other, has been considered in relatively few instances. It can, however, be said that what rulings there are indicate generally, but not uniformly, that contracts of the kind mentioned are invalid."). See, e.g., Ash v. New York Univ. Dental Ctr., 164 A.D.2d 366, 564 N.Y.S.2d 308 (1990); Olson v. Molzen, 558 S.W.2d 429 (1977) (holding exculpatory contract between patient and doctor invalid as contrary to public policy). Here, the home inspector held himself out as an expert and a professional. The disparity between the consequences of negligence to the home inspector and to the home buyer, like that between a physician and a patient, is very substantial.
In evaluating the enforceability of contractual provisions, we also look to express statements of public policy. Declarations of public policy may derive from various sources, including legislation. In late 1997, our Legislature enacted the Home Inspection Professional Licensing Act (the Act), N.J.S.A. 45:8-61 to -77. The legislation was signed into law on January 8, 1998, effective 180 days thereafter. The Act requires that a person must be licensed to perform home inspection services. N.J.S.A. 45:8-67. In order to be licensed, the person must meet certain qualifications, such as possessing a minimum amount of experience and passing a home inspector's examination. The legislation also provides for regulatory oversight of the home inspection industry by the Home Inspection Advisory Committee. N.J.S.A. 45:8-63.
Important to our analysis here is the Act's provision requiring home inspectors, as a licensing prerequisite, to maintain errors and omissions insurance with a minimum coverage of $500,000 per occurrence. N.J.S.A. 45:8-76a. This legislative provision evinces a clear expression of policy that home inspectors shall not only provide recourse by being fully liable for their errors and omissions, but shall maintain *915 substantial insurance coverage to assure payment for any such liability. With this public policy clearly announced in January 1998, we have no doubt that the limitation of liability provision before us was in violation of that policy.
We recognize that the regulatory mechanisms envisioned by this legislation were not fully implemented by the summer of 1999, when the contract before us was entered into. Time was apparently needed to constitute the regulatory body and draft, propose, and adopt regulations. The regulations have now been adopted, N.J.A.C. 13:40-15.1 to -15.23, but they were not effective until June 3, 2002. Thus, we have nothing in the record to establish whether CAL or Vasys could have obtained a home inspection license prior to entering into the contract with plaintiffs.
Nonetheless, this law was "on the books," and the public policy thus announced, a full year-and-a half before the home inspection contract between the parties in this case was entered into. The legislative history behind the Act supports our conclusion regarding the public policy. Press accounts included in the official legislative history clearly express the Legislature's purpose to protect home buyers from negligence by home inspectors. They include the following statements:
[1] Currently, New Jersey has no regulatory authority over the home inspection industry. Inspectors often are hired to examine the structural soundness and any deficiencies of a home prior to sale.
"The current law in New Jersey is so weak that it does little to prevent anyone with a flashlight and clipboard from passing himself off as a home inspector," said Assemblyman Anthony Impreveduto, D-Hudson, one of the bill's sponsors.
[Bill Lets State License All Home Inspectors, Press of Atlantic City, Dec. 16, 1997, at "State Briefs."]
[2] Governor Whitman on Thursday signed a bill giving New Jersey what is arguably the nation's toughest controls on the home-inspection industry, protecting home buyers from scam artists and unqualified inspectors.
....
"It's a good piece of legislation, it's a piece of legislation that protects the biggest asset consumers ever buy," said Impreveduto. The key for consumers is that the license is dependent upon insurance.

To guarantee that an inspector maintains coverage, insurance companies will be required to notify state regulators if the policy is canceled. Without insurance, a consumer's only recourse to recover losses is to sue the inspector and the inspection company.

[Kevin G. DeMarrais, N.J. Enacts Controls on Home Inspectors, The Record, Jan. 9, 1998, (emphasis added).]
[3] [R]ecent surges in the popularity of home inspections have created an overpopulated inspection industry where not all inspectors have the training and experience to do a good job. Cost-conscious consumers find out too late that trying to save $50 to $100 on an inspection can result in an inadequate review. Unfortunately, this can translate into thousands of dollars in unexpected repairs being discovered after the sale.
....
[According to various legislators] consumers will no longer be hit with costly repairs after being misled about the condition of a house by unqualified inspectors.

....
These provisions, together with the educational, testing and insurance requirements of the law, provide the structure necessary to insure New Jersey's *916 home-buying consumers that they will be protected.
[Thomas Kraeutler, Inspecting Home Inspectors 154 N.J.L.J. 13, October 5, 1998 (emphasis added).]
The legislative intent here is clear, and it provides, through our State's elected representatives, a clear declaration of public policy in New Jersey. Where legislation protecting the interests of the home-buying public has been adopted for the home inspection industry, its protections cannot be contracted away. See, e.g., McCarthy v. National Association for Stock Car Auto Racing, 48 N.J. 539, 542-43, 226 A.2d 713 (1967) (holding that an exculpation clause signed by a stock car driver in favor of the raceway was unenforceable because it was in contravention of legislation regulating the safety of auto racing and could not be contracted away). Home buyers who avail themselves of the services of home inspectors who hold themselves out as experts, must be protected and must have meaningful recourse against the home inspector in the event errors are made.
We note that the Act classifies home inspection service as a professional service, and places jurisdiction for regulation under the State Board of Professional Engineers and Land Surveyors. N.J.S.A. 45:8-63. As we have stated, the nature of home inspection certainly qualifies it as a professional service. Inspecting the structure of a home requires "specialized knowledge," that is "predominantly mental or intellectual." Erlich, supra, 208 N.J.Super. at 264, 505 A.2d 220. As we have also stated, exculpation or limitation of liability clauses are particularly disfavored with regard to professional services.
In summary, the limitation of liability provision in this contract is unconscionable and violates the public policy of our State. The contract is one of adhesion, the bargaining power of the parties is unequal, the impact of the liability clause is negligible to the home inspector while potentially severe to the home buyer, and the provision conflicts with the purpose of home inspection contracts and our Legislature's requirement of accountability by home inspectors for their errors and omissions.

III
We comment briefly on the arbitration clause. Plaintiffs argue before us as they did before the trial court, that because defendants brought their partial summary judgment motion seeking a declaration enforcing the limitation of liability provision, defendants participated in the litigation and waived their right to enforce the arbitration clause. We disagree. Until a final judgment is entered, the viability of enforcement of the arbitration clause continues to exist. Wasserstein v. Kovatch, 261 N.J.Super. 277, 290, 618 A.2d 886 (App.Div.), certif. denied, 133 N.J. 440, 627 A.2d 1145 (1993). Defendants Vasys and CAL argue they were forced into litigation because of plaintiffs' failure to honor the arbitration clause. However, "[n]ot every foray into the courthouse effects a waiver of the right to arbitrate." Shevlin v. Prudential Commercial Ins. Co., 256 N.J.Super. 691, 700, 607 A.2d 1062 (Law Div.1991). Parties waive the right to arbitration where they commence litigation or use the litigation process improperly, such as to gain pretrial disclosure not generally available in arbitration. Id. at 700-01, 607 A.2d 1062. Here, however, defendants answered the complaint against them to prevent default judgment. This is an acceptable effort to preserve the status quo pending arbitration, and does not constitute waiver. Id. at 701, 607 A.2d 1062.
Vasys and CAL have raised two other issues in their appellate brief. They point to a non-assignability clause in the contract and contend that it is actually the Williams' who are pursuing the claim against them, which should be barred by *917 that clause. They also point to a sixty-day statute of limitation provision in the contract, which they contend was not complied with. However, no orders adverse to Vasys and CAL were entered by the trial court regarding these provisions, and no cross-appeal has been taken. These issues are not before us. The effect of these contractual provisions and any other appropriate matters can be dealt with upon remand.
Of course, we express no comment on whether or not Vasys or CAL breached any duty to Lucier and Haley under their agreement. Our holding here is only that if they are liable, the extent of any damages for which they should be liable is not limited by the terms of the contract.
The order of May 11, 2001 is affirmed. The order of January 5, 2001 is reversed. The matter is remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] As discussed in Part III of this opinion, plaintiffs have also appealed another order, which enforced an arbitration provision in the contract. We affirm that order.
[2] It is immaterial that the cost here, $128,500, was actually quite modest.