2011 VT 118

# James Glassford and Heidi Glassford v. The BrickKicker and GDM Home Services, Inc.

[35 A.3d 1044]

No. 09-362

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed November 4, 2011

2

*Kimberly B. Cheney* and *Zachary K. Griefen* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Plaintiffs-Appellants.

*Margaret Marion Strouse*, Burlington, for Defendants-Appellees.

¶ 1. **Skoglund, J.** Plaintiffs James and Heidi Glassford, who brought suit to obtain compensation for an allegedly negligent home inspection, appeal the superior court's order granting summary judgment in favor of the home inspector based on the terms of a binding arbitration agreement in the parties' contract. In this appeal, we consider whether the superior court erred in rejecting plaintiffs' contention that the terms of the home inspection contract are unconscionable under the common law and unfair and deceptive under Vermont's Consumer Fraud Act (CFA). We find unconscionable the contractual provisions limiting liability to the cost of the inspection and yet requiring arbitration that would necessarily cost more than the amount of the liability limit. Accordingly, we reverse the superior court's decision and remand the matter for further proceedings consistent with this opinion.

¶ 2. In 2005, plaintiffs contracted to buy a house in Barre Town, contingent upon a satisfactory home inspection. After being given

a list of home inspection companies, plaintiffs contacted the first name on the list, defendant GDM Home Services, Inc., a local franchisee of a national home inspection company called The BrickKicker (hereinafter collectively referred to as BrickKicker). On December 22, 2005, the date of the scheduled inspection, only Mrs. Glassford was present. Before beginning the inspection, the home inspector presented a contract for Mrs. Glassford to sign. She signed the contract and paid the $285 inspection fee.

¶ 3. The two-page contract was on a preprinted form drafted by BrickKicker. The back page of the contract contains ten numbered paragraphs in small print without headers. Paragraphs 5 and 6 in the middle of the back page state as follows:

> Client understands and agrees that it would be extremely difficult to determine the actual damages that may result from an inspector's failure to properly perform duties under this contract. As such, it is agreed that the liability of the Inspection Company arising out of this inspection and subsequent Property Inspection Report shall be limited to actual damages, or equal to the inspection fee charged, whichever is less. IT IS AGREED THAT THIS IS AN ADEQUATE LIQUIDATED DAMAGE AND IS IN NO WAY INTENDED AS A PENALTY, ADMISSION OF NEGLIGENCE OR DEFAULT SETTLEMENT. THE CLIENT UNDERSTANDS AND AGREES THAT ACTUAL DAMAGES, OR EQUAL TO THE INSPECTION FEE PAID, WHICHEVER IS LESS, IS THE CLIENT'S SOLE AND EXCLUSIVE REMEDY NO MATTER THE THEORY OF LIABILITY UPON WHICH THE CLIENT SEEKS RECOVERY . . . .

> Any dispute, controversy, interpretation or claim for, but not limited to, breach of contract, any form of negligence, fraud or misrepresentation or any other theory of liability arising out of, from or related to this contract, the inspection or inspection report shall be submitted to final and binding arbitration under Rules and Procedures of the Expedited Arbitration of Home Inspection Disputes of Construction Arbitration Services, Inc.

¶ 4. Thus, the contract limited BrickKicker's liability to no more than the $285 charged for its inspection. This limitation effectively foreclosed arbitration because the "Rules and Procedures of the Expedited Arbitration of Home Inspection Disputes," which were not set forth in the contract presented for Mrs. Glassford to sign, required the party seeking arbitration to pay, among other things, an initial arbitration fee of $1350, $450 each day after the first day's hearing, and travel expenses for an arbitrator residing more than fifty miles from the arbitration site. In short, a homebuyer disputing BrickKicker's performance would have to pay, at minimum, a $1350 arbitration fee to recover no more than the $285 inspection fee.

¶ 5. The contract also required plaintiffs to pay BrickKicker's costs, attorney's fees, and insurance policy deductibles in any arbitration in which BrickKicker prevailed, but imposed no such reciprocal obligation on BrickKicker. Further, the contract provided that plaintiffs waived any and all claims against BrickKicker unless they gave BrickKicker notice of the claim "within 90 days from the date of the inspection or 30 days after taking possession of the property, whichever is later" and allowed BrickKicker to reinspect the property.

¶ 6. Following his inspection of plaintiffs' prospective home, BrickKicker's inspector produced a detailed report declaring the house to be "[a] nice new home in need of routine maintenance and observation." Plaintiffs bought the house for $230,500. According to their complaint, after moving in they found numerous defects which should have been discovered and reported by the inspector, and which, they claim, would have caused them to break the sales contract. Nearly three years later, in December 2008, plaintiffs brought suit against BrickKicker, alleging negligence in the home inspection.

¶ 7. BrickKicker moved to dismiss the suit, arguing that the complaint was barred by the contract's time-limit waiver and binding arbitration clause. Treating BrickKicker's motion as one for summary judgment, the court invited the parties to submit statements of undisputed fact and competing memoranda. Plaintiffs opposed BrickKicker's motion and attached a copy of the arbitration rules that the contract indicated would govern any arbitration proceedings. Plaintiffs argued that the arbitration fees required by the rules, combined with the contract's provision limiting liability, effectively insulated BrickKicker against any

liability based on its services and assured that no arbitration proceeding would take place.

¶ 8. In January 2009, plaintiffs amended their complaint to allege that the contract violated the CFA because, among other things, while purporting to permit arbitration to resolve complaints concerning BrickKicker's services, the contract in fact shifted all risk of loss to plaintiffs, absolved BrickKicker of any responsibility to perform its services in a satisfactory manner, and effectively precluded plaintiffs from obtaining any possible remedy if they incurred damages because of a negligent inspection. BrickKicker responded in opposition. On March 3, 2009, plaintiffs amended their undisputed statement of facts to assert that the rules previously attached to their opposition to BrickKicker's earlier motion to dismiss were the same as the rules governing the arbitration agreement. Nothing in the record indicates that BrickKicker opposed this amendment or disputed that the rules submitted by plaintiffs were the arbitration rules referred to in the contract.

¶ 9. On July 2, 2009, the superior court dismissed the complaint, ruling that arbitration was the sole forum for plaintiffs to seek redress because the contract's arbitration clause was "utterly clear on its face." See 12 V.S.A. § 5652(a) (stating that arbitration agreements are "valid, enforceable and irrevocable" unless otherwise void as contracts). Although there was no separate written acknowledgement of arbitration signed by the parties, as required by § 5652(a), the court determined that preemptive federal law required only that that the arbitration agreement be in writing. 9 U.S.C. § 2; cf. *Bradley v. Harris Research, Inc.*, 275 F.3d 884, 889 (9th Cir. 2001) (holding that special arbitration conditions imposed by state law, such as bold notice provisions, are preempted by federal law). The court did not address plaintiffs' CFA claims or their claims of unconscionability except to note that plaintiffs made "no claim that the arbitration clause itself is unconscionable" but instead directed "their 'unconscionability' arguments to other substantive terms of the contract such as the limitations on liability." Finally, the court rejected BrickKicker's argument that plaintiffs had failed to timely seek arbitration, noting the lack of prejudice in the delay.

¶ 10. Plaintiffs moved for reconsideration, arguing, among other things, that the court ignored their claims that certain contract provisions were unconscionable under the common law and decep-

tive under the CFA, and that the arbitration clause was unenforceable due to the practical impossibility of arbitration, given that the arbitration fee exceeded any potential recovery under the liability cap in the contract. The court rejected these arguments, concluding that the unconscionability claim failed because (1) plaintiffs made "no allegation of any procedural unconscionability" concerning the formation of the contract, such as unequal bargaining power or use of fine print in the contract; and (2) the arbitration fee complained about was "nowhere specified in any of their multiple complaints, . . . and no statement of material facts presents it either." The court also stated, with respect to the limited liability provision, that plaintiffs had failed to support the proposition that limitations of liability are unenforceable or unconscionable per se. As for plaintiffs' claims that the arbitration clause was unconscionable, the court stated that the only references to the arbitration rules and fees were through counsel's oral arguments and an unauthenticated attachment to an earlier filing, rather than in the pleadings.

¶ 11. In short, according to the court, plaintiffs failed to allege procedural unconscionability, which it deemed to be a necessary predicate to their unconscionability claim, and further failed to produce a record or legal authority to support their claim that the challenged contractual provisions were substantively unconscionable. The court also determined that the contract did not violate 9 V.S.A. § 2461(b), a provision in the CFA, because that section merely prohibits a contract from excluding civil penalties or attorney's fees upon a finding of a consumer fraud violation, which the subject contract did not do.

¶ 12. Plaintiffs appeal the dismissal of their suit, and BrickKicker cross-appeals, seeking attorney's fees per the contract's provision allowing for recovery of attorney's fees upon BrickKicker prevailing "in the lawsuit or any other action." We review de novo a motion for summary judgment, applying the same standard of review as the trial court. *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 9, 188 Vt. 197, 6 A.3d 1117. Summary judgment is appropriate only when "the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quotation omitted); see V.R.C.P. 56(c)(3). Therefore, we afford the nonmoving party "the benefit of all reasonable doubts and inferences." *Doe v. Forrest*, 2004 VT 37, ¶ 9, 176 Vt. 476, 853 A.2d 48.

■ ■ ¶ 13. For the reasons stated below, we find unconscionable the subject contract's illusory remedy for any claim for damages resulting from its provisions limiting liability to the inspection fee and requiring binding arbitration costs that would exceed the amount of the liability limit. Because the limited liability and arbitration provisions are interconnected in creating the substantively unconscionable illusory remedy, we strike both of them, notwithstanding the contract's boilerplate severability clause. The superior court was mistaken in assuming that the presence of procedural unconscionability is required to void a contract based on it containing unconscionable terms. See *Val Preda Leasing, Inc. v. Rodriguez*, 149 Vt. 129, 135, 540 A.2d 648, 652 (1987) (finding contract to be unconscionable based on its substantively unfair terms even though factors relevant to unconscionability in formation of contract were not present). In any event, we also note significant elements of procedural unfairness in the contract, as described below.

¶ 14. The principal barrier in the contract to the possibility of any relief for plaintiffs is the provision limiting liability to the $285 inspection fee. Plaintiffs challenged this provision, among others, before the superior court. As noted, the trial court ruled in its decision on plaintiffs' motion for reconsideration that the contract's limitation on liability is not per se invalid and that plaintiffs failed to cite any "legal authority for the proposition that limitations of liability such as this are unenforceable or unconscionable."

¶ 15. Notwithstanding the trial court's statement suggesting otherwise, plaintiffs submitted a memorandum of law attacking the contract's limitation on liability, citing primarily this Court's decision in *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 332, 670 A.2d 795, 797-98 (1995). On appeal, plaintiffs renew their claim that the contract's limitation on liability is unconscionable, this time additionally relying upon decisions from other jurisdictions that are directly on point. See *Pitts v. Watkins*, 2004-CA-00062-SCT, ¶¶ 10-11, 905 So. 2d 553 (Miss. 2005) (finding unconscionable arbitration and limited liability provisions in home inspection contract); *Lucier v. Williams*, 841 A.2d 907, 912 (N.J. Super. Ct. App. Div. 2004) (finding unconscionable limited liability provision in home inspection contract). These cases are among the numerous decisions from around the country that have addressed allegedly unconscionable home inspection contracts. Typically, the challenged

contracts contain provisions, as in the case before us, setting forth short notice requirements, limiting liability to the amount of the inspection fee, and compelling arbitration that would incur costs exceeding the liability limit.

¶ 16. Here, as noted, the contract's limitation on BrickKicker's liability creates a disingenuous arbitration remedy for plaintiffs. Even standing alone, limiting liability to $285 irrespective of the actual damages incurred by the customer would be, at minimum, highly suspect. But under this contract's governing arbitration rules, plaintiffs could not recover even the cost of the filing fee much less any compensatory damages. See *Lucier*, 841 A.2d at 913 (stating that liability limit renders "the underlying purpose of the contract worthless"). Thus, the liability limit in the contract is a complete impediment to any effective remedy for the home inspector's negligence or even intentional tort. As a number of courts have held, a provision limiting liability to damages that are insignificant in comparison with a customer's actual loss is really an exculpatory clause insulating the home inspector from all liability. See *Mullins v. N. Ky. Inspections, Inc.*, 2010 WL 3447630, at *1 (Ky. Ct. App. 2010) (noting that potential recovery is de minimus and "tantamount to an exculpation clause"); *Russell v. Bray*, 116 S.W.3d 1, 8 (Tenn. Ct. App. 2003) (holding, in case where home inspection contract contained clause limiting defendants' liability to lesser of cost of repair or amount of inspection fee, that "the exculpatory clause in the contract between Plaintiffs and Defendants is contrary to public policy and, thus, unenforceable").

¶ 17. Because the contract before us contains what are, in effect, exculpatory clauses in consumer transactions, we turn to *Dalury*, 164 Vt. at 331, 670 A.2d at 797, for guidance. *Dalury* holds that exculpatory clauses are valid as long as they do not violate public policy. In determining whether exculpatory clauses violate public policy, we adopted the standards from *Tunkl v. Regents of University of California*, 383 P.2d 441, 444 (Cal. 1963), as "relevant considerations." *Dalury*, 164 Vt. at 333, 670 A.2d at 798. The *Tunkl* standards provide that an exculpatory agreement is invalid if it exhibits some or all of the following characteristics:

> It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great

importance to the public, which is often a matter of practical necessity for some members of the public. The party holds [it]self out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks [the party's] services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or [the seller's] agents.

*Tunkl*, 383 P.2d at 445-46.

¶ 18. *Dalury* involved a clause, contained in a ski lift ticket, that released the ski area from all liability caused by its negligence and resulting in injury to the skier. Over arguments that operating a ski area is not a business suitable for public regulation and does not perform a "service of great importance to the public," this Court found that the exculpatory clause was void as against public policy. *Dalury*, 164 Vt. at 332-34, 670 A.2d at 797-99. We stressed that the ski area was open to the public, and that thousands of people skied at the resort every day. We also stressed the premises liability policy placing responsibility for maintenance of the land on those who own or control it. *Id.* at 334-35, 670 A.2d at 799.

¶ 19. Although *Dalury* has distinctive facts and does not involve a home inspection contract, the factors that were central in that case are also present here. The record in this case indicates that GDM Home Services is a local franchisee of BrickKicker, a national home inspection corporation. Its services are generally open to the public, and plaintiffs chose it as one of three home inspection services referred by the seller's realtor. Although Vermont is one of a minority of states that have not regulated home inspection contractors, many states have adopted regulatory

schemes. See http://www.homeinspector.org/stateregulations/default.aspx (detailing state home inspector regulation as of Oct. 25, 2011). Thus, home inspection contracting is clearly a "business of a type generally thought suitable for public regulation," the first of the *Tunkl* factors. 383 P.2d at 445.

¶ 20. As in *Dalury*, a legitimate public interest arises "as a result of the seller's general invitation to the public to utilize the . . . services in question." *Dalury*, 164 Vt. at 334, 670 A.2d at 799. Thus, as in *Dalury*, public policy requires consequences when home inspectors do not perform with due care. Only the inspectors are able to conform their services to their contractual obligations and the necessary quality. If the law immunizes them from liability for their negligence, it eliminates the greatest and most important incentive for proper performance.

¶ 21. The importance of home inspection services to consumers cannot be doubted, as explained in *Lucier*:

> The foisting of a contract of this type in this setting on an inexperienced consumer clearly demonstrates a lack of fair dealing by the professional. The cost of homes in New Jersey is substantial. It has often been said that the purchase of a home is usually the largest investment a person will make in life. The purchase of a home is, for most people, a very infrequent occurrence, and a very major undertaking. People may buy a home once in a lifetime, or not very often. Home inspectors, on the other hand, conduct a volume operation. As a businessperson who possesses knowledge about and experience in the industry, [the inspector] is aware of the cost of repairing major defects. In fact, that is a major selling point of his service to residential buyers.

*Lucier*, 841 A.2d at 912. As stated in *Mullins*, the home purchaser must "take the precautionary steps to properly assess that the price of the residence reflects its actual value." 2010 WL 3447630, at *4. Thus, a competent inspection is not only crucial to "negotiating the price for the residence," but it is normally required by the financing agency, which also relies upon it. *Id.*; see also *Russell*, 116 S.W.3d at 6 (home inspectors are "performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public").

¶ 22. At the time of the home inspection, consumers have normally already decided to buy a house based on factors such as aesthetics and amenities, and "the only issue left is the integrity of the house." *Pitts*, 2004-CA-00062-SCT, ¶ 11. The purpose of a home inspection "is to give a consumer a rational basis upon which to decline to enter into a contract to buy, to provide lawful grounds to be relieved from a contractual commitment to buy, or to offer a sound basis upon which to negotiate a lower price." *Herner v. Housemaster of Am., Inc.*, 793 A.2d 55, 67 (N.J. Super. Ct. App. Div. 2002). If home inspectors can exempt themselves from liability for their negligence, they could "walk through the house in five minutes, fabricate a report, and escape liability, without any consideration of the consequences of their conduct" on the homebuyer's decision involving hundreds of thousands of dollars. *Pitts*, 2004-CA-00062-SCT, ¶ 11; see *Lucier*, 841 A.2d at 912 (finding unconscionable limited liability provision in home inspection contract because potential recovery is so nominal that it has practical effect of avoiding all responsibility for professional inspector's negligence). Limiting the liability to the inspection fee does not provide a realistic incentive to act diligently, see *Lucier*, 841 A.2d at 912 ("To be enforceable, the amount of the cap on a party's liability must be sufficient to provide a realistic incentive to act diligently."), particularly given the countervailing incentive to please the referring realtor by soft-pedaling the inspection and allowing the sale to go forward. See *Herner*, 793 A.2d at 67 (finding unconscionable commercial practice and inherent conflict where record demonstrated that realtor referred buyers to home inspecting service that depended heavily on such referrals and thus had strong incentive to facilitate sales).

¶ 23. The importance of home inspection services also relates to the last of the *Tunkl* factors: whether, "as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." 383 P.2d at 446. The affidavit of Heidi Glassford, who was primarily responsible for the house purchase, indicates that she is a high school graduate who has no expertise or experience in housing construction and had never before purchased a house. The purchase and sales agreement had a provision allowing plaintiffs to back out of the contract if the house inspection revealed defects. Thus, the house purchase depended upon an acceptable inspection report, and plaintiffs'

right under the contract to decline to purchase a house with major defects as set forth in an inspection also depended on a competent housing inspection. In short, plaintiffs were entirely at the mercy of BrickKicker and without other means of protection if BrickKicker was careless in its housing inspection.

■ ¶ 24. There is one other point, apart from the *Tunkl* factors, that bears on the validity of the subject contract's liability limitation. According to its terms, the limitation clause is justified not to limit liability, but instead as a liquidated damages provision. The clause provides that because "it would be extremely difficult to determine the actual damages," defendant's liability is limited "to actual damages, or equal to the inspection fee charged, whichever is less." The clause then goes on, in capital letters, to provide as follows: "THIS IS AN ADEQUATE LIQUIDATED DAMAGE AND IS IN NO WAY INTENDED AS A PENALTY, ADMISSION OF NEGLIGENCE OR DEFAULT SETTLE-MENT." Liquidated damages provisions are valid if they meet a three-part test: "(1) because of the nature or subject matter of the agreement, damages arising from a breach would be difficult to calculate accurately; (2) the sum fixed as liquidated damages must reflect a reasonable estimate of the likely damages; and (3) the provision must be intended to compensate the nonbreaching party and not as a penalty for breach or as an incentive to perform." *New England Educ. Training Serv., Inc. v. Silver St. P'ship*, 156 Vt. 604, 613, 595 A.2d 1341, 1346 (1991); see also *Highgate Assocs., Ltd. v. Merryfield*, 157 Vt. 313, 316-20, 597 A.2d 1280, 1282-84 (1991) (applying the test).

■ ¶ 25. The clause in this case fails to meet any of the elements of the test for a valid liquidated damages provision. Determination of the customer's damages in a case such as this represents a routine application of tort damages rules to the particular facts of the case. The liability limit is not a reasonable estimate of the customer's likely damages, and thus cannot be intended to compensate the nonbreaching party. See *Mattegat v. Klopfenstein*, 717 A.2d 276, 280 (Conn. App. Ct. 1998) (holding that home inspection contract liability limit set at amount of inspection fee is not valid liquidated damages provision under similar standards). Indeed, as we note below, the liquidated damages language in this contract appears to be created to cover up the true purpose of the liability limitation.

¶ 26. Moreover, the attempt to justify the liability limit as liquidated damages can only be a source of confusion. The provision states that it would be extremely difficult to measure actual damages but then sets actual damages as one of two alternative limits on recovery. It describes the liability limit as not a penalty — as if any customer would think that the totally inadequate remedy was somehow a penalty imposed on the contractor. As one commentator observed, "many consumers would not understand or be able to describe a 'liquidated' damage concept" as a justification for a liability limit in a home inspection contract. G. Marsh, *The Liability of Home Inspectors in Residential Real Estate Sales*, 59 Ala. L. Rev. 107, 153 (2007).

¶ 27. In addition to the substantive unconscionability, there are also elements of procedural unconscionability in this case, particularly with respect to the limited-liability clause, which is contained in boilerplate language without a separate heading in a contract of adhesion.[1] The front page of the contract describes the elements and limitations of the inspection, but does not contain any of the provisions about which plaintiffs complain — the arbitration requirement, the limit on liability, or the notice requirement and shortened limitation period. The customer's signature line is on the front so that the customer can sign without ever turning over the document. The reverse side of the page lists the "INSPECTION CONTRACT CONDITIONS." The conditions are in eleven separate paragraphs, generally in very small print and all without separate headers. The limited liability provision is in the middle of fine print in paragraphs five and six and is not identified by a header. Two sentences about the liability limit are in capital letters, but the first is about the liquidated damages

---

[1] The customer is not offered the opportunity to pay a higher price to avoid the liability limitation. The contract indicates that the customer can purchase a "Comprehensive Home/Building Inspection" that covers many additional items, takes much more time to complete, and costs a minimum of $3500, but the contract also states that such an inspection is done pursuant to a different contract — the terms of which are not set forth. Although the limited record does not indicate whether the home purchaser can go to another inspector to avoid the limitation on liability, litigation around the country suggests that these limited-liability clauses are standard for home inspection contracts. In this case, plaintiffs had an inspection done by another inspector after they began to learn of the defects. The contract of the second inspection contractor is in the record and contains a substantially identical liability limitation.

justification. Only the second expresses clearly that the customer's only remedy is damages, but subject to the liability limit.

¶ 28. In *Universal Underwriters Insurance Co. v. Allstates Air Cargo, Inc.*, decided under federal common law, we acknowledged that a preprinted freight airbill could contain a liability limitation on the reverse side if the limitation was referenced on the front side of the printed form. 2003 VT 8, ¶ 9, 175 Vt. 475, 820 A.2d 988 (mem.). We declined to enforce the limitation, however, in part because of "the lack of a highlighted warning that such a limitation is present." *Id.* ¶ 10. The highlighting here is a little better because a statement of the liability limit is made in slightly larger print in capital letters. Nevertheless, the statement is still quite inconspicuous because it is located in the middle of eleven paragraphs full of contractual terms. Moreover, the statement is wholly undercut by an attempt to justify the liability limitation as a liquidated damage amount. Cf. *Val Preda Leasing, Inc.*, 149 Vt. at 135-36, 540 A.2d at 652 (holding that car rental agreement limiting liability for damages caused by lessee to $600 is nullified by difficult-to-understand exceptions contained in boilerplate language on reverse side of agreement).

¶ 29. By way of comparison, in *Head v. U.S. Inspect DFW, Inc.*, the court upheld the liability limit in part because it "was conspicuously set apart in the Inspection Agreement, enclosed in a box, and separately initialed by [the customer]." 159 S.W.3d 731, 748 (Tex. Ct. App. 2005). The contract in *Head* contains the kind of conspicuous presentation that minimizes the risk of a procedural unconscionability challenge. See Marsh, *supra*, at 152. In contrast, none of the devices used to make the liability limit conspicuous in *Head* were used here. To the contrary, the critical contractual provisions limiting the customers' liability and creating, in effect, an illusory arbitration remedy are set forth in fine print, unidentified, on the back page of a standard contract of adhesion.

 ¶ 30. For the reasons outlined above, we conclude that the contract's limited liability and binding arbitration provisions are unconscionable and thus unenforceable. Although the contract contains a boilerplate severability clause, we decline to strike only the limited liability provision, considering that both clauses operate together to effectively deny plaintiffs a forum to resolve their claims. Theoretically, we could sever just the limited liability

provision and force plaintiffs to proceed to binding arbitration, recognizing that Vermont law favors arbitration. *Union Sch. Dist. #45 v. Wright & Morrissey, Inc.*, 2007 VT 129, ¶ 12, 183 Vt. 555, 945 A.2d 348 (mem.). But we decline to do so. BrickKicker should not benefit from a binding arbitration clause that is a major component of the scheme to offer plaintiffs an illusory remedy for any claims they might have against BrickKicker. We may sever both clauses from the contract because neither one, independently or joined with the other, constitutes "the essential purpose" of the parties' agreement to provide home inspection services. See *In re Poly-America, L.P.*, 262 S.W.3d 337, 360 (Tex. 2008) ("An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement.").

¶ 31. Finally, plaintiffs also argue that BrickKicker's contract violates the CFA as a matter of law in a number of ways. Having upheld the contract's provisions compelling arbitration and limiting liability, the trial court apparently viewed plaintiffs' CFA arguments as an attempted end-run around its rulings, and thus rejected them summarily with little analysis. Considering the abbreviated treatment given the CFA arguments below, we specifically hold that, notwithstanding any law-of-the-case restrictions, plaintiffs are free to renew those arguments before the superior court on remand. In short, we exercise our discretion not to rule on any CFA claims at this juncture so that the superior court may consider them in the first instance in light of our decision here.

*Reversed and remanded for further proceedings consistent with this opinion.*

¶ 32. **Dooley, J.**, concurring and dissenting. This case reminds me of the child's game, pickup sticks. The trick is to pick up the right stick very carefully. Here, the right "stick" is the clause limiting liability to the cost of the inspection, and I concur completely in the decision to strike down that clause. Were this case to proceed in arbitration or in court, the limitation of liability would prevent any meaningful relief. It fails the *Dalury v. S-K-I, Ltd.* standard for an exculpatory clause and is not a valid liquidated damages provision. 164 Vt. 329, 332-33, 670 A.2d 795, 797-98 (1995). It is unconscionable as a matter of law. Therefore, I concur with the majority's decision to strike the limited-liability provision.

¶ 33. The right "stick," however, is not the arbitration clause, at least in this Court. Vermont law favors arbitration. *Union Sch. Dist. #45 v. Wright & Morrissey, Inc.*, 2007 VT 129, ¶ 12, 183 Vt. 555, 945 A.2d 348 (mem.). Standing alone, a requirement to arbitrate disputes under a home inspection contract is valid. See 9 U.S.C. § 2; 12 V.S.A. § 5652(a). Courts in many of the states that have struck down the liability limit in a home inspection contract, or both the liability limit and the arbitration requirement, have upheld the arbitration requirement standing alone. See *Lynes v. Calcagni Assocs.*, 2006 WL 894913, at **2-3 (Conn. Super. Ct. 2006); *Meglio v. Taylor Real Estate, Inc.*, 2006 WL 3153426, at *4 (N.J. Super. Ct. App. Div. 2006); *Bozich v. Kozusko*, 2009-Ohio-6908, ¶¶ 12-13, 2009 WL 5150264 (Ct. App.). Once the limitation on liability is removed, the major reason for striking down the arbitration requirement — that it costs more to obtain arbitration than the homeowner can recover — is also gone. If there were no limitation of liability in the contract, I do not believe that on this record we would strike down the arbitration requirement as a matter of law in this Court; we should not strike it down here when the same circumstances are created by removing the limitation of liability. This is the holding of *Bozich*, 2009-Ohio-6908, ¶¶ 21-22, the appellate decision with facts closest to those before us. It is entirely consistent with the law of remedies in unconscionable contract cases.

¶ 34. In general, if a contract or a term within a contract is unconscionable, a court can choose either to refuse to enforce the contract, or it may choose to enforce the remainder of the contract with the unconscionable term excised so as to avoid any unconscionable result. Restatement (Second) of Contracts § 208 (1981). Courts generally may sever an illegal or unconscionable provision of a contract as long as the provision does not constitute the essential purpose of the agreement but, rather, is only a part of multiple reciprocal promises in the agreement. See *In re Poly-America, L.P.*, 262 S.W.3d 337, 359-60 (Tex. 2008). Under this theory, it is possible to continue with a requirement for arbitration but sever terms that make the arbitration unconscionable. *Id.* at 360. Severing or restricting illegal contract terms is often preferable to voiding an entire contract. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 696 (Cal. 2000).

¶ 35. My disagreement over the majority decision to strike down the arbitration requirement does not mean that I believe that

plaintiffs should be required to proceed to arbitration in this case. Plaintiffs challenged the arbitration requirement on a number of grounds, one of which involved its interaction with the limitation on liability. Plaintiffs particularly challenged the fairness of an industry-created arbitration process with a single arbitrator selected by the arbitration administrator. They also challenged the fee provisions generally and the cost-shifting provision that allows the home inspection company, but not the homeowner, to collect "all associated costs, reasonable attorney fees and insurance policy deductible assignments incurred by the" home inspection company. I would remand for the superior court to reconsider whether the arbitration requirement is unconscionable in light of our decision regarding the limitation of liability.

¶ 36. **Burgess, J.,** concurring and dissenting. Certainly BrickKicker's one-sided and practically impossible arbitration clause is as unenforceable as its self-defeating terms were undisclosed and unconscionable. This clause is so ridiculously unfair that it defies reformation and should be simply foreclosed, entitling plaintiffs to pursue, and BrickKicker to respond to, traditional civil remedies. There is no basis upon which to reform the clause, since the parties have no other underlying agreement. "Vermont law and public policy strongly favor arbitration as an alternative to litigation for the 'efficient resolution of disputes,' " but *only* when parties adopt arbitration by mutual and "voluntary agreement." *Lamell Lumber Corp. v. Newstress Int'l, Inc.*, 2007 VT 83, ¶ 9, 182 Vt. 282, 938 A.2d 1215 (internal citations omitted). Courts "cannot order parties to submit to arbitration absent a voluntary agreement . . . or a statute authorizing such an order." *Id.* (citing *Gates v. Gates*, 168 Vt. 64, 72, 716 A.2d 794, 800 (1998). Neither circumstance obtains here. This arbitration clause cannot be revised in a manner fairly reflecting any mutually bargained-for expectation of the parties and so should be severed from the contract. Therefore, I concur with the majority's decision to strike the arbitration provision.

¶ 37. On the other hand, and just as certainly, the liability cap and other limitations agreed to by plaintiffs have yet to be proven unfair, oppressive, or unconscionable. The undisputed evidence is that plaintiffs were under no compulsion whatsoever to get a home inspection, hire BrickKicker, or agree to its terms. In the disputed evidence so far, plaintiffs claim BrickKicker directed Heidi Glassford to sign the contract without explanation, while

BrickKicker denies this and claims Mrs. Glassford declined even to read the contract. It may well be that, once proven, the "totality of the circumstances" referred to in *Dalury v. S-K-I, Ltd.* will justify holding all of BrickKicker's contract limitations unconscionable. 164 Vt. 329, 334, 670 A.2d 795, 798 (1995). Because the facts are not yet established to satisfy the legal standard for unconscionability, I dissent from what is a premature judgment that the contract's liability cap and claims limitations are contrary to public policy and unenforceable.[2]

¶ 38. The undisputed facts, as follows, are sparse and not enough to support summary judgment at this time. Plaintiffs contracted to buy a house contingent upon a satisfactory home inspection. Not knowledgeable about construction, plaintiffs were given a list of home inspectors and called BrickKicker because it was the first name on the list. The inspector asked Mrs. Glassford to sign the contract before he began work. In addition to the unworkable arbitration clause, the contract contained express limitations on liability and explicit deadlines for performance complaints. Mrs. Glassford signed the contract without reading it and paid the $285 inspection fee. Not yet factually settled were that plaintiffs were vulnerable, that BrickKicker took any advantage of them, that Mrs. Glassford failed to realize or misunderstood what she signed and apparently agreed to, or that plaintiffs received any less (aside from the arbitration clause) than what they contracted for. Later dissatisfied with their house compared to the positive inspection report, plaintiffs sued BrickKicker for faulty performance and to avoid the contract's arbitration clause and liability and time limitations.

¶ 39. The trial court granted BrickKicker's motion to dismiss, erroneously ruling that arbitration was binding. Plaintiffs' other claims were not addressed because, as the court noted, plaintiffs proffered no record to support unconscionability in the making of

---

[2] What public policy and what undisputed facts support the notion that for $285, and in the face of an express disclaimer of liability beyond that fee, homebuyers should reasonably expect BrickKicker to virtually guarantee the construction and value of a new $230,500 home? What public policy suggests that, on the few undisputed facts presented so far, the modest fee is not fairly consistent with the explicitly limited service offered in the contract and accepted by Mrs. Glassford? The majority does not say. The facts do not suggest that more is at stake than what the contract represents on its face. Thus, the majority's assumptions about what plaintiffs were buying and what BrickKicker was selling are unsupportable on the record.

the contract, nor law that the contract's limitations were substantively unconscionable per se. Except for the arbitration issue, none of plaintiffs' claims of unconscionability, adhesion, negligence, CFA violations, time limitations, or liability cap were subject to final adjudication on a fully developed factual record. Similarly, the court did not reach BrickKicker's defenses at law or under the contract. All of these matters should be remanded to the superior court for summary judgment or, if the facts remain in dispute, for trial.

¶ 40. The majority proceeds as if these issues were sufficiently joined below, but the superior court was quite correct in pointing out that plaintiffs cited no authority for their proposition that the liability cap was unenforceable or unconscionable under the facts of this particular case. Instead, plaintiffs claimed, generally, that such a cap was unenforceable just because it was part of an adhesion contract. It is settled, however, that contracts of adhesion — typically nonnegotiated standardized forms — are not unreasonable per se. See *Muhammad v. Cnty. Bank of Rehoboth Beach*, 877 A.2d 340, 349 (N.J. Super. Ct. App. Div. 2005) (reiterating that "the mere fact that a contract is adhesive does not render it unenforceable," and instructing that "a finding . . . of adhesion is the 'beginning, not the end, of the inquiry' ") (internal citations omitted) (*rev'd on other grounds*, 912 A.2d 88 (N.J. 2006)); see also *Vermont Mut. Ins. Co. v. Parsons Hill P'ship*, 2010 VT 44, ¶¶ 28-29, 188 Vt. 80, 1 A.3d 1016 (applying the plain language of an insurance contract that favored insurer, despite insurance contracts being adhesive).

¶ 41. Plaintiffs also invoked *Dalury*, 164 Vt. at 332, 670 A.2d at 797, as authority against enforcing an exculpatory clause, but *Dalury* was a negligence case and plaintiffs failed to establish that the critical principles of negligence law and public safety concerns underlying *Dalury* apply to the breach of contract performance claimed here. When, as here, economic loss without physical injury is claimed by plaintiff, the obligation of defendant is governed by the contract terms, and not the law of negligence. See *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 30, 181 Vt. 513, 928 A.2d 497 (reiterating that "[t]he economic-loss rule prohibits recovery in tort for purely economic losses").

¶ 42. Unlike the ski area in *Dalury* selling thousands of ski lift tickets to the general public, BrickKicker has yet to be shown to have engaged in any such "substantial number" of sales from

which could arise a significant public interest in premises liability, or something like it, justifying judicial intervention in a private contractual relationship in order to promote public safety. 164 Vt. at 334, 670 A.2d at 799. Nor was it established, as it was for the ski area in *Dalury*, that BrickKicker's marketing of inspection services warrants the same judicial protections deemed necessary for a "routine business practice," like a ski area, which "creates a foreseeable hazard [of personal injury] for its customers." *Id.* Absent parallel facts, plaintiffs' reliance on *Dalury* was unfounded.[3]

¶ 43. Assuming, for argument, that plaintiffs did raise a legal basis upon which to find their contract unconscionable, plaintiffs presented no undisputed facts to sustain their theory for purposes of summary judgment. The circumstances of making the contract are disputed. Plaintiffs claim that the contract was presented to Ms. Glassford with an order to sign it. BrickKicker denies this and contends that, given an opportunity to read the contract, Mrs. Glassford chose not to do so. Plaintiffs have yet to establish that they were put into a contractual position, as in *Dalury*, somehow equivalent to helplessly assuming unknown risks of personal harm without remedy so inimical to public policy as to require the same kind of court-imposed veto. *Id.* at 335, 670 A.2d at 799.

¶ 44. The majority's contrary conclusion notwithstanding, plaintiffs' evidence particularly failed to meet the so-called *Tunkl* factors considered in *Dalury* for determining whether an exculpatory agreement violates public policy. *Id.* at 332, 670 A.2d at 797-98. (referring to *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 444 (Cal. 1963). For example, there is no government regulation to vindicate and no undisputed evidence that BrickKicker's services are of "great importance to the public" or are "a practical necessity" to anyone. *Id.* Nor is there any evidence that BrickKicker's services were so "essential" to plaintiffs that the contractor "possessed a decisive advantage of bargaining strength," or that plaintiffs were otherwise placed

---

[3] The majority's own extension of *Dalury* to this case is no more sustainable. Given the facts so far established, BrickKicker has little or nothing in common with a ski resort purporting to insulate itself from selling risks of bodily injury due to its own negligence. *Dalury*, dealing with voluminous liability waivers in the face of common negligence, resulting injury, and a demonstrated public interest in business premises safety, is plainly distinguishable from this breach-of-contract case.

"under the control" of the contractor. *Id.* Neither plaintiffs nor the majority explain how, in this case, the sole fact that contractor was knowledgeable about new home building, while Mrs. Glassford was not, led to an unfair advantage in bargaining or an unconscionable contract.

¶ 45. On appeal, plaintiffs divert from their unconscionable-per-se argument onto a different legal tack, citing to *Pitts v. Watkins*, 2004-CA-00062-SCT, 905 So. 2d 553 (Miss. 2005), and *Lucier v. Williams*, 841 A.2d 907 (N.J. Super. Ct App. Div. 2004), declaring liability limits unenforceable when in violation of state law and arising from oppressive circumstances. Overlooking our usual convention barring new arguments for the first time on appeal, see *Maguire v. Gorruso*, 174 Vt. 1, 9, 800 A.2d 1085, 1092 (2002) (arguments not raised below are waived), the majority not only entertains these cases, but finds them on point, despite the absence in this case of any comparable and necessary legal or factual common denominator. In *Pitts*, a boilerplate claims limitation violated a statutory prohibition, and its liability cap resulted from an "absence of meaningful choice on the part of one of the parties." 2004-CA-00062-SCT, ¶ 19 (quotations omitted). *Lucier* turned on the facts that the contractor conducted thousands of inspections, that he refused to negotiate a take-it-or-leave-it contract, that he enjoyed a "grossly disparate" bargaining advantage, and that the home inspection contract violated state regulations. 841 A.2d at 912.

¶ 46. If *Pitts* and *Lucier* have any point germane to the instant case, it is that predicate facts must be established before reaching a legal determination of unconscionability. No such facts are reached here. This is not unlike plaintiffs' failure to meet the *Tunkl* factors. There is no statutory or regulatory violation, and plaintiffs present no undisputed facts of unequal bargaining leverage. Plaintiffs have yet to prove lack of choice between contractors, or that such a contractor had to be relied on at all. In contrast to *Tunkl* and contrary to the majority's formulation, there is no evidence that home inspection services are important to the public as a matter of "practical necessity," or "essential" to plaintiffs in particular. *Tunkl*, 383 P.2d at 445-46. There is no undisputed evidence that BrickKicker exercised any actual advantage in bargaining, that plaintiffs were at the contractual mercy of BrickKicker, or that the contract was otherwise arrived at unfairly. In contrast to cases cited by the majority, plaintiffs'

financing was not contingent upon an inspection, nor was the inspection a regulated activity.[4] There is no undisputed evidence that bargaining was foreclosed.

¶ 47. Plaintiffs' undisputed facts for purposes of summary judgment present little more than they were less knowledgeable than their contractor, but nevertheless rushed into a one-sided contract with express limitations when they did not have to, and which they did not bother to read beforehand. Those bare circumstances establish no unconscionability per se, nor any "Hobson's choice" of unfair adhesion to render the contract otherwise unconscionable under our law or any case law cited by the majority. Plaintiffs may indeed have the evidence necessary to support the majority's legal theory, but it should be introduced and tried prior to judgment. Absent such proof, I respectfully dissent from this part of the decision.

¶ 48. I am authorized to state that Chief Justice Reiber joins in this concurrence and dissent.

---

[4] Because Vermont does not regulate home inspections, the majority must look to home inspection regulation in other states to satisfy the *Tunkl* consideration of whether the commercial activity at issue is "generally thought suitable for public regulation" — thereby warranting judicial regulation of the activity by invalidating certain contract provisions. Nonetheless, Vermont public policy, as reflected by the Legislature, leaves private home inspections unregulated, suggesting a lack of perceived public importance of such inspections in this state. Thus, the majority addresses a problem that does not exist. In any event, invalidation of unconscionable conditions should depend on the terms of a contract and the circumstances of its formation, not on foreign regulation irrelevant to Vermont.